# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**CHRISTIANA JENSEN,**
                    **Plaintiff,**

             **v.**                                          **Case No. 17-C-0755**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the Social Security Administration**
                    **Defendant.**

## DECISION AND ORDER

The Social Security Administration found plaintiff Christiana Jensen disabled as a child, awarding her supplemental security income benefits. After she turned 18, the agency reviewed her status under the rules for adults, finding her no longer disabled as of September 1, 2010. (Tr. at 116, 138, 171, 940.) Plaintiff challenged this determination, but an Administrative Law Judge ("ALJ") upheld it following a hearing. (Tr. at 118-31.) Plaintiff sought judicial review, and I remanded the matter on the parties' stipulation. (Tr. at 1078-80.) The remand order indicated, in pertinent part, that:

> the ALJ will reevaluate Plaintiff's residual functional capacity and account for all of her moderate and other limitations, including those resulting from her moderate difficulties in concentration, persistence, or pace; explain how the mental limitations in the residual functional capacity assessment were crafted and how they accommodate assessed limitations; and reevaluate the medical evidence including medical opinion evidence.

(Tr. at 1079.)

The ALJ held a second hearing, at which he received additional expert testimony, then issued another unfavorable decision. Plaintiff again seeks judicial review, arguing that the ALJ failed to consider the opinions of two agency psychological consultants, who recommended a

number of "moderate" mental limitations; improperly evaluated the credibility of her statements regarding the severity of her symptoms and limitations; and relied on flawed vocational testimony in concluding that jobs existed within her limitations.

## I.  FACTS AND BACKGROUND

**A.    Medical Evidence**

Plaintiff alleged disability based on a variety of impairments, including attention deficit hyperactivity disorder ("ADHD"), learning disorder, anxiety, depression, seizures, Tourette's syndrome, hearing loss, and fibromyalgia.  She also reported a history of abuse and post-traumatic stress disorder symptoms.  As part of its review of her status, the agency obtained the opinions of several consulting experts.  The record also contains records and reports from treating sources.

### 1.    Consultants

On September 14, 2010, Jack Spear, Ph.D., reviewed the record and prepared a psychiatric review technique form, evaluating plaintiff under Listing 12.02, organic mental disorders, and Listing 12.05, mental retardation.  (Tr. at 407.)  Under the "B criteria" of the Listings, he found mild restriction of activities of daily living; no difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation.  (Tr. at 417.)  In a mental residual functional capacity ("RFC") report, he endorsed moderate limitations in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday without interruptions from psychological symptoms, and perform at a consistent pace without an unreasonable number of breaks.  (Tr. at 403-04.)  He concluded that plaintiff retained "the

ability to perform (at least) unskilled work." (Tr. at 405.)

On January 20, 2012, Darrell Hischke, Ph.D., performed a mental status evaluation. Dr. Hischke opined that plaintiff no longer met the diagnostic criteria for ADHD, although she did continue to have some problems with concentration, likely due to her anxiety. Plaintiff also reported a history of Tourette's syndrome and seizures. She described the seizures as periods of time when she stares, lasting from 30 seconds to 10 minutes. She indicated that she had been told she had mental retardation, and she did have a learning disorder when she was in school. She had difficulty with big words and sometimes had trouble understanding instructions and needed reminders on how to complete a task. Dr. Hischke diagnosed anxiety disorder, not otherwise specified, and history of learning disorder, with a GAF of 70.[1] Regarding her ability to do work-related activities, he opined:

> Her ability to understand, remember, and carry out instructions appears to be mildly limited. Her ability to sustain concentration, persistence, and pace appears to be mildly limited. Her ability to relate to supervisors and coworkers appears to be within normal limits. Her ability to cope with routine work stress and adapt to changes appears to be mildly limited.

(Tr. at 476.)

On February 15, 2012, Janis Byrd, M.D., reviewed the record and completed a physical RFC assessment, listing a primary diagnosis of seizures and secondary diagnosis of chronic

---

[1]GAF ("Global Assessment of Functioning") rates the severity of a person's symptoms and her overall level of functioning. Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting herself or others. Scores of 51-60 reflect "moderate" symptoms and 61-70 "mild" symptoms. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000). The fifth edition of the DSM, published in 2013, abandoned the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." Williams v. Colvin, 757 F.3d 610, 613 (7th Cir. 2014) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013)).

pelvic pain. (Tr. at 479.) Dr. Byrd opined that plaintiff could perform light exertional level work (Tr. at 480), with no further limitations other than avoiding even moderate exposure to hazards (machinery, heights, etc.) (Tr. at 483). Considering the medical evidence and plaintiff's reports, Dr. Byrd found a light RFC with a precaution for seizures reasonable. (Tr. at 486.)

On February 16, 2015, Edmund Musholt, Ph.D., prepared a psychiatric review technique form, evaluating plaintiff under Listing 12.02, organic mental disorders, and 12.06, anxiety-related disorders. (Tr. at 495.) Under the B criteria of the Listings, he found no restriction of activities of daily living; no difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation. (Tr. at 505.) In a mental RFC report, he endorsed moderate limitations in her ability understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday without interruptions from psychological symptoms, perform at a consistent pace without an unreasonable number of breaks, and respond appropriately to changes in the work setting. (Tr. at 487-88.) He concluded that Dr. Hischke's "assessment is reasonable and supports ability to perform unskilled work." (Tr. at 489.)

## 2. Treating Sources

On March 1, 2011, plaintiff saw a therapist at Empower Counseling, complaining of difficulty sleeping, nightmares, and recurrent distressing memories. (Tr. at 769.) The therapist diagnosed learning disability, anxiety disorder with panic attacks, and mood disorder, with a GAF of 59. (Tr. at 770.) Plaintiff received counseling at this location from March to September 2011 (Tr. at 773-86) and at Professional Psychological Services in 2012 and 2013 for anxiety

disorder (Tr. at 833-45).[2]

On September 23, 2013, plaintiff saw Dr. Arshad Ahmed, a neurologist, for evaluation of her seizures, which she described as brief staring spells where she became unresponsive. She had previously been treated with Topamax and Clonidine but had been off those medications due to pregnancy and breast feeding. She was unable to elaborate clearly on the duration or frequency of these spells. She did not report a history of convulsive seizures. On exam, she displayed delayed thought processing and mild cognitive difficulties. (Tr. at 766.) Dr. Ahmed prescribed Lamictal. (Tr. at 767.)[3]

---

[2]In July 2013, plaintiff applied for services with the state Division of Vocational Rehabilitation ("DVR"). (Tr. at 863-67.) She was found eligible for services based on cognitive impairment and anxiety disorder. (Tr. at 914.) Initially placed on a wait list, she started receiving services in January 2014. (Tr. at 884.) She was assisted with resume and application preparation and interview skills seeking part-time employment involving cleaning or cooking. The records indicate that she attended all of her meetings and seemed motivated, walking to three of these meetings at a distance of 5-½ miles. (Tr. at 885-86.) The counselor indicated that plaintiff would need a lot of support when seeking work and when she secured a job. (Tr. at 888.) In July 2014, DVR assisted her in obtaining a job as a crew member at a Wendy's restaurant. (Tr. at 906.) At that time, she advised the counselor she had not had a seizure in four months and was on no medication for seizures. (Tr. at 907.)

[3]On October 17, 2013, plaintiff had a normal EEG test, although this did not rule out the possibility of epilepsy. (Tr. at 925.) On November 4, 2013, and January 14, 2014, plaintiff noted improvement in the frequency of her spells, although they still occurred once or twice per day. (Tr. at 921, 923.) On April 14, 2014, plaintiff again reported improvement in the frequency of her episodes on Lamictal; they still occurred once or twice per day, although they were not as severe as they used to be. (Tr. at 919.) On October 15, 2014, plaintiff reported no episodes for about seven months. (Tr. at 38.) Dr. Ahmed started her on a low dose of Celexa for depression. He also sent her for a neuro-psychological evaluation based on her complaint of memory problems. He indicated that PTSD from a previous abusive relationship, anxiety and depression, along with the possibility of a baseline cognitive impairment could also be playing a role in her memory complaints. Based on EEG testing, which did not capture epileptic form changes correlating to her spells, he suspected they were also part of the anxiety or conversion disorder. (Tr. at 39.) On January 7, 2016, plaintiff told Dr. Ahmed she had one episode in May 2015, which was brief, lasting a second, while driving home from work at Wendy's. She had not had any episodes since. (Tr. at 1547.)

5

On February 11, 2014, plaintiff saw Tim Caufield, Ph.D., for evaluation of possible cognitive limitations related to a history of seizure disorder and difficulties in the past when she attended school. (Tr. at 847.) Based on testing and interview, Dr. Caufield assessed major depressive disorder, generalized anxiety disorder, mild mental retardation, seizure disorder and Tourette's syndrome, with a GAF of 52 and a guarded prognosis. Regarding her capability for work, he stated: "She reportedly does not have difficulty following simple directions adequately, but is prone to seizure episodes, and mood fluctuations that would likely lead to difficulties with her ability to maintain competitive employment." (Tr. at 851.) Plaintiff saw Dr. Caufield for counseling sessions through July 2014. (Tr. at 852-62.)

On October 31, 2014, Michael Kula, Psy.D., completed a neuro-cognitive evaluation at the request of Dr. Ahmed. (Tr. at 18). Dr. Kula diagnosed adult attention deficit disorder, pervasive learning disability, anxiety disorder, and dysthymic disorder-severe. On testing, her abilities predominantly fell in the low average range, commensurate with her prior learning disability and underlying attention deficit disorder. The test data also indicated adequate functioning with regard to her frontal lobe functioning, in that she was able to address simple, moderate, and even moderately complex measures of frontal lobe functioning appropriately. However, she would have difficulty with regard to extremely complex measures of frontal lobe functioning. Therefore, she would have difficulty in being able to establish, maintain, and change mental sets, as well as initiate, plan, and organize activities and projects. Likewise, she would have difficulties with regards to concept formation, flexible problem solving, planning coherently, working methodically, setting priorities, and strategizing mindfully. It appeared that her pre-existing learning disability, attention deficit disorder, as well as her severe level of anxiety and depression, were seen as the etiology for her difficulty in being able to focus,

6

attend, and concentrate on information. Dr. Kula recommended psycho-pharmacological and psycho-therapeutic treatment for her severe levels of anxiety and depression. (Tr. at 23.)

In a January 16, 2015, report, Dr. Ahmed listed a diagnosis of generalized non-convulsive epilepsy, with a stable prognosis, and symptoms of brief staring episodes and short-term memory impairment, which would occasionally interfere with the attention and concentration needed to perform even simple work tasks. (Tr. at 33.) He opined that plaintiff could continuously sit for 20 minutes and stand for 20 minutes, and in an eight-hour workday stand/walk for about four hours and sit for at least six hours. (Tr. at 33-34.) She also required a job that permitted shifting positions at will and unscheduled breaks. She could frequently lift 10 pounds, occasionally 20, and occasionally engage in postural movements. (Tr. at 34.) Her impairments were likely to produce good and bad days, and more than four absences per month. These limitations applied since September 23, 2013. (Tr. at 35.)

Finally, plaintiff received chiropractic treatment from Michael Anderson, D.C., for neck, upper back, shoulder, and lower back pain.[4] On August 30, 2016, Dr. Anderson opined that plaintiff may be able to tolerate 16-20 hours of work per week with sedentary to light duty activities. (Tr. at 1562.)

## B. Hearing Testimony

### 1. First Hearing

On July 8, 2014, plaintiff appeared with counsel for a hearing before the ALJ. (Tr. at 45.) The ALJ also summoned a medical expert and a vocational expert ("VE"). (Tr. at 46.)

---

[4]Dr. Anderson also referred plaintiff to a rheumatologist, Dr. Farzan Mahmood, who suspected fibromyalgia and prescribed Cymbalta and cyclobenzaprine. (Tr. at 1413-33.)

### a.    Plaintiff

Plaintiff testified that she was 23 years old, married, with two children, ages five and one. (Tr. at 52-53.)  She graduated high school, in special education classes.  She had never worked full-time (Tr. at 53) but had worked part-time at the YMCA and a card outlet shop (Tr. at 54-55).  She was then being assisted by DVR with interviews/resumes and training to work as a crew member at Wendy's.  (Tr. at 55-57.)  She did not yet have a driver's license, having failed the test numerous times.  (Tr. at 76.)  Her husband drove her.  They had been married about three years.  (Tr. at 58.)  She cared for the children while her husband worked.  (Tr. at 59.)

Plaintiff testified that on a typical day she would wake up, make cereal for breakfast, and watch a movie or go outside to play with the kids.  (Tr. at 59.)  She would read books to them "that are little and not as many words."  (Tr. at 60.)  They would have lunch and do more playing or getting things done around the house.  Her husband prepared notes for things that needed to be done, which he would read to her a few times.  (Tr. at 60.)

Plaintiff testified that she was able to attend to her own hygiene and prepare simple meals for herself and the children.  (Tr. at 61.)  She was also able to do a little bit of cleaning but had problems bending because of her back.  She saw a chiropractor every week, which helped.  She was able to walk without a cane or assistive device.  (Tr. at 62.)  She was unable to do laundry by herself because of the weight, but she could operate the machine.  (Tr. at 63.)  If she shopped by herself she would get distracted and buy junk food.  (Tr. at 64.)  She was able to use a food stamp card to checkout.  She also played card games and watched TV with the kids.  (Tr. at 65.)  She had one friend she texted, but they did not really spend time together.  (Tr. at 66.)  She had a computer at home but no internet, and they just used it for

music.  She played X-box once in awhile.  (Tr. at 67.)  She denied other hobbies.  (Tr. at 68.)

Plaintiff testified that she had nerve problems – her left arm went numb, and she got a lot of pain in her shoulders and upper back.  (Tr. at 69.)  She saw the chiropractor for that.  (Tr. at 70.)  She took "brain pills" for her staring spells, which helped.  (Tr. at 70-71.)  She was able to follow a routine and take her pills as prescribed.  (Tr. at 77-78.)  During these spells, which lasted from 10 seconds to 10 minutes, she would just stare and do nothing.  On the medication, they happened once or twice per day; she did not know how often the spells happened before the pills.  (Tr. at 75.)  Her daughter recognized when she was having a spell and would try to get her out of it, smacking her face.  (Tr. at 76.)  She did not worry about taking care of her children when he had a spell, and she had never been to the emergency room because of a spell.  (Tr. at 77.)  She also saw a psychologist once or twice per week for counseling, which she found helpful.  (Tr. at 72-74.)  She did not think she could live on her own.  (Tr. at 76.)

### b.    Dr. Kravitz

The medical expert, Larry Kravitz, a psychologist, identified severe impairments of anxiety disorder and learning disability; his review of the file did not support a finding of ADHD.  (Tr. at 82-83.)  However, he noted that the record at that point did not include the DVR records or the records from plaintiff's treating psychologist.  (Tr. at 89.)  He continued:

> [T]he claimant presents to me here as fairly concrete.  Her word usage is very limited, her grammatical use is very simplistic.  She seems to become confused on a periodic basis with any communication that's more than very simple in nature.  So she seems more limited than the record would indicate.

(Tr. at 92.)

Based on the record, however, Dr. Kravtiz testified that plaintiff did not meet or equal a Listing.  (Tr. at 92.)  On review of the B criteria, he found moderate restriction in activities of

9

daily living, social functioning, and concentration, persistence and pace, with no episodes of decompensation.  (Tr. at 93.)

### c. VE

Plaintiff's counsel and the ALJ agreed that, at that time, plaintiff had no past relevant work that rose to the level of substantial gainful activity ("SGA").  (Tr. at 98.)  The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and experience, exertionally unrestricted, but needing to avoid concentrated exposure to hazards, unable to maintain the attention or concentration necessary to perform detailed or complex tasks, limited to simple, routine, repetitive, low stress tasks with few job changes, with limited problem solving or decision making, and unable to have more than occasional interaction with coworkers, supervisors, or the public.  (Tr. at 98-99.)  The VE testified that such a person could work as a laundry worker (DOT # 369.687-018, light, SVP 2); document preparer (DOT # 249.587-018, sedentary, SVP 2); and final assembler (DOT # 713.687-018, sedentary, SVP 2).  If the person required unscheduled breaks of undetermined duration and four or more absences per month, that would preclude all competitive employment.  (Tr. at 102.)

### 2. Second Hearing

On November 20, 2016, plaintiff appeared for her hearing on remand.  The ALJ also summoned a medical expert, psychological expert, and vocational expert.  (Tr. at 965.)

### a. Plaintiff

Plaintiff testified that she was then 25 years old, with a high school level education.  (Tr. at 976.)  She lived with her husband and two children, then ages three and eight.  (Tr. at 978, 993.)  In 2014 and 2015, she worked as a crew member at Wendy's, preparing food and

working the register. (Tr. at 979.) She indicated that she left that job "because [her] body was falling apart even more" and mentally she was "having even more higher stress and anxiety." (Tr. at 980.) She worked there, part-time, for about one year (Tr. at 981-85), but testified that the manager had to keep reminding her of certain rules, such as using a scoop to put ice in a cup, because she would forget them (Tr. at 985, 999). She also had trouble concentrating and focusing on a task, such as remembering to turn off the water, causing the sink to overfill. (Tr. at 999.) She had not received further services from DVR after leaving this job. (Tr. at 986.)

Plaintiff testified that she was able to manage her own personal care. (Tr. at 990-91.) She was also able to care for her children, keep the home tidy, and shop for her herself and her kids. (Tr. at 991-92.) She further testified that she was able to use a computer at the library and e-mail on her phone. (Tr. at 995.) She also tried crocheting. (Tr. at 996.) Her daughter helped her with the laundry. She had trouble bending to clean due to lower back pain. (Tr. at 997.) She also felt overwhelmed with the chores at times and had a hard time keeping up. (Tr. at 997-98.) Her husband wrote down a list of things to be done around the house and items to buy at the store. (Tr. at 998-99.)

Plaintiff testified that she experienced panic attacks, where she would have chest pain and difficulty breathing. She took medications for anxiety, depression, and pain. (Tr. at 1000.) She did not socialize with people aside from her husband and children. (Tr. at 1001.) She had been able to get a driver's license after failing the test 10 times. (Tr. at 1002.)

Plaintiff testified that she could lift 15-25 pounds and walk two blocks before she had to sit down and rest. (Tr. at 1002-03.) She weighed 252 pounds at a height of 5'8". Due to her weight, she had trouble tying her shoes and picking things up off the floor. (Tr. at 1003.) She testified that she also experienced migraine headaches every day. (Tr. at 1003-04.) She also

indicated that she continued to experience seizures, where she would stare and not move, for two to five minutes. (Tr. at 1004-05.) She was on medication for the staring spells, which helped. (Tr. at 1006.) She also complained of pain in her wrist, ankle, knee, shoulder, and neck. (Tr. at 1007.) She said she had pain in these areas 24/7 over the entire six year period at issue. (Tr. at 1008.) She received chiropractic care and medication, which helped. (Tr. at 1008-09.) She also detailed abuse when she was a child and during a previous relationship. (Tr. at 1009-10.)

### b.    Dr. Holan

The medical expert, Keith Holan, M.D., board certified in internal medicine, testified that plaintiff had the medically determinable impairments of seizure disorder, history of hearing loss in both ears, and fibromyalgia, which did not meet or equal a Listing. (Tr. at 988, 1011-12.) He also considered obesity based on the testimony. (Tr. at 1013-14.) Based on these impairments, he endorsed an RFC for light work, with occasional climbing, frequent postural movements, avoiding all exposure to hazards due to the history of seizures, and using hearing protection in the work environment. (Tr. at 1014-15.)

### c.    Dr. Adams

The psychological expert, Rick Adams, Ph.D., identified severe mental impairments of ADHD, anxiety disorder, depression, borderline intellectual functioning, and learning disorder, none of which met or equaled a Listing. (Tr. at 989-90, 1027-31.) Under the B criteria, he assessed mild limitations of activities of daily living; moderate difficulties social functioning; moderate difficulties in concentration, persistence, and pace; and no episodes of decompensation. (Tr. at 1031-33.) He recommended she be limited to occasional contact with

supervisors, co-workers, and the general public; simple work tasks in a routine situation with few changes in the work setting; and without regular quotas. (Tr. at 1033-34.) Dr. Adams testified that the moderate concentration, persistence, and pace limitations would have the biggest impact on more complex mental functioning; it would not necessarily preclude very simple activities. (Tr. at 1037.)

### d. VE

The ALJ's hypothetical question to the VE at this hearing assumed a person of plaintiff's age, education, and work experience, limited to light work, occasional climbing, frequent postural movements, avoiding all hazards involving unprotected heights and dangerous moving machinery, and using hearing protection in the work environment. The person would further be limited to simple tasks in a routine setting with few job changes, and unable to have more frequent than daily quotas. (Tr. at 1041.) The VE testified that this person could work as a machine feeder/injection molding machine tender (DOT # 556.685-038, SVP 2, light); laundry worker (DOT # 589.685-038); and production inspector/sorter (DOT # 753.587-010). (Tr. at 1042-43.) The VE indicated that his responses were consistent with the DOT. (Tr. at 1043.)

On follow-up questioning by counsel and the ALJ, the VE acknowledged that the Dictionary of Occupational Titles covered simple and detailed tasks under the GED level. He indicated that he translated the ALJ's hypothetical for simple tasks into unskilled work, with the SVP designations of 1 or 2. (Tr. at 1048-50.)

## C. ALJ's Decision

On December 19, 2016, the ALJ issued an unfavorable decision. (Tr. at 935.) The ALJ determined that plaintiff suffered from the severe impairments of seizure disorder, history of

sensory hearing loss, fibromyalgia, obesity, ADHD, anxiety disorder, depression, and learning disorder, none of which met or equaled a Listing. (Tr. at 940-41.) Under the B criteria of the mental impairment Listings, the ALJ found mild restriction of activities of daily living; moderate difficulties in social functioning; and moderate difficulties in concentration, persistence, and pace; with no episodes of decompensation. (Tr. at 942-43.) Plaintiff did not satisfy the Listing for mental retardation, as her IQ scores on testing exceeded 70. (Tr. at 944.)

The ALJ then determined that plaintiff retained the RFC for light work, with occasional climbing, frequent postural movements, avoiding all hazards (including unprotected heights and moving machinery), and utilizing hearing protection. She was further limited to simple tasks in a routine work setting with few job changes, no more frequent than daily quotas, and occasional contact with coworkers, supervisors, and the public. In making this finding, the ALJ considered plaintiff's alleged symptoms and the medical opinion evidence. (Tr. at 944.)

Plaintiff, age 25 at the time of the second hearing, testified that she lived with her husband and two children, ages three and eight. She reported completing high school and working most recently in September 2015 as a part-time fast food worker. She alleged that she continued to be disabled due to her physical and mental impairments, which limited her ability to lift, squat, bend, walk, kneel, talk, climb, remember, complete tasks, concentrate, understand, and use her hands. (Tr. at 945.) The medical records documented a history of non-convulsive seizure disorder, treated with medications including Lamictal and Topamax; a history of arthralgias and myalgias, with a likely diagnosis of chronic pain syndrome/fibromyalgia, treated with medications including Cymbalta and cyclobenzaprine; symmetrical hearing loss; anxiety, depression, learning disorder, and ADHD, treated with counseling and medications including Elavil and Celexa. (Tr. at 945-46.) The ALJ stated:

14

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements regarding the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. First, the medical records fail to fully substantiate the claimant's allegations of disabling symptoms. Second, the claimant reported activities suggest[ing] that the claimant has greater physical and mental capacity than alleged.

(Tr. at 946.)

Regarding plaintiff's physical impairments, the ALJ noted that exams generally revealed reasonable physical function, and she received limited treatment. (Tr. at 946-47.) Regarding her seizures, the medical records documented good control with medication. Regarding her hearing loss, providers noted good word recognition and that she was not a candidate for hearing aids, although she was advised to wear ear protection. (Tr. at 947.) "In sum, the objective medical evidence documents diagnoses of fibromyalgia, nonconvulsive seizures or 'staring spells,' obesity, and high frequency bilateral sensory hearing loss. However, the claimant's treatment records reflect that she retained reasonable physical function and required infrequent, routine and conservative medical treatment." (Tr. at 947.) The ALJ accommodated her physical symptoms with a restriction to light work with limited climbing; her seizures with avoidance of all hazards; and her hearing loss with work allowing use of hearing protection. (Tr. at 947.)

The ALJ further found that the nature and scope of plaintiff's activities did not support a finding of debilitating physical impairment. He noted that she walked 5-½ miles to DVR meetings; worked part-time as a fast food worker, which involved dishwashing, preparing food, and cashiering; cared for her young children, including lifting her youngest, who weighed 25 pounds; tended to household chores, including cleaning and laundry; and enjoyed outdoor

15

activities, such as fishing. "While these activities alone do not constitute a normal day-to-day level of activity, they demonstrate that, despite experiencing symptoms of her physical impairments, the claimant has remained able to engage in a number of normal day-to-day activities, many of which involved at least a light level of exertion." (Tr. at 948.)

As to her mental impairments, the records documented a history of anxiety and depression, as well as a learning disorder. However, plaintiff received limited mental health treatment, her mental status exams were largely unremarkable, providers failed to note significant cognitive deficits, and she demonstrated reasonable mental function during the consultative exam with Dr. Hischke. (Tr. at 948-49.) The ALJ further noted that plaintiff was able to complete high school, cooperate with DVR, and maintain part-time employment involving mental abilities and social interaction for over a year. The ALJ found plaintiff's mental impairments could be accommodated by a restriction to work involving only simple tasks in a routine setting with few job changes, no more frequent than daily quotas, and occasional contact with workers, supervisors, and the public. (Tr. at 950.)

As for the opinion evidence, the ALJ gave great weight to the opinion of Dr. Holan, a board certified internist, who reviewed all the medical evidence prior to the hearing, had the opportunity to question plaintiff, and heard her testimony. He opined that plaintiff could perform a range of light work with occasional climbing, frequent postural activities, no exposure to hazards, and use of hearing protection. The ALJ found this assessment reasonable and consistent with the evidence as a whole, striking the appropriate balance between plaintiff's subjective reports and the objective medical evidence, which documented routine and conservative treatment and largely unremarkable clinical and diagnostic findings. Dr. Holan's opinion was further supported by Dr. Byrd's February 2012 report, which the ALJ also afforded

great weight.  (Tr. at 950.)

The ALJ gave Dr. Ahmed's January 2015 report little weight, as his opinions were inconsistent with the overall evidence of record, including the benign diagnostic findings, mild clinical findings, and plaintiff's activities (e.g., caring for two young children and tending to household chores).  The ALJ further noted that Dr. Ahmed's treatment notes from September 2013 through April 2014 documented no deficits in physical function (i.e., normal gait, intact coordination, 5/5 power, intact sensation) and reported control of staring spells with medication. The ALJ also found his opinion regarding absenteeism inconsistent with plaintiff's ability to maintain part-time employment for over a year and consistently attend DVR meetings, walking over five miles to attend three of those meetings.  Finally, his opinion appeared to consider plaintiff's mental impairments, which fell outside his area of expertise.  (Tr. at 951.)

The ALJ also considered the 2016 opinion of plaintiff's chiropractor, Michael Anderson, who limited plaintiff to part-time work involving sedentary to light duty work.  The ALJ gave this opinion little weight, as it was not consistent with the overall evidence of record, including mild clinical findings, unremarkable diagnostic evidence, and reported improvement with treatment. The ALJ particularly noted treatment records in which plaintiff described her pain as mild with only infrequent and mild exacerbation, and Dr. Anderson's physical exams noting mild decrease in cervical range of motion, normal lumbar range of motion, and negative straight leg raise bilaterally.  (Tr. at 951.)

Regarding plaintiff's mental impairments, the ALJ gave great weight to the opinions of Dr. Adams, who reviewed all of plaintiff's records prior to the hearing, had the opportunity to question her, and heard her testimony at the hearing.  (Tr. at 951-52.)  Dr. Adams opined that plaintiff had mild restriction in activities of daily living; moderate difficulties in social functioning;

moderate difficulties in concentration, persistence, and pace; and no episodes of decompensation. He further opined that her mental impairments would require a limitation to occasional contact with supervisors, coworkers, and the public, and simple routine tasks with few changes in the work setting and no more frequent than daily quotas. The ALJ found Dr. Adams's testimony reasonable and consistent with the evidence as a whole, appropriately balancing plaintiff's largely unremarkable mental status exams, infrequent and conservative treatment, and daily activities with the objective evidence of deficits in cognitive functioning and subjective reports of decreased concentration, memory, and comprehension. (Tr. at 952.)

The ALJ also gave great weight to the report from Dr. Kula, as he had the opportunity to personally observed and examine plaintiff for the express purpose of evaluating her neuro-cognitive function. He incorporated Dr. Kula's opinion into the RFC, restricting plaintiff to simple tasks in a routine work setting with few job changes and no more frequent than daily quotas. (Tr. at 952.)

The ALJ gave partial weight to the testimony of Dr. Kravitz from the 2014 hearing. Specifically, he declined to adopt Dr. Kravitz's assessment of moderate, rather than mild, restriction in activities of daily living, based on the record evidence that plaintiff tended to her personal care, cared for her children, assisted with household chores, and maintained part-time employment. (Tr. at 952.) He also gave partial weight to Dr. Caufield's report, crediting his opinion that plaintiff could follow simple directions, but discounting his opinion that plaintiff would have trouble maintaining employment due to seizures and mood fluctuations. The ALJ found the latter opinion inconsistent with plaintiff's treatment history for seizures, observations of treating and examining providers noting appropriate interaction, and plaintiff's part-time employment that did not end due to termination for deficits in either cognitive or social function.

18

Finally, the ALJ gave partial weight the 2012 report from Dr. Hischke, who found only mild limitations, concluding that the more recent evidence, including plaintiff's subjective reports, supported moderate limitations in social functioning and concentration, persistence, and pace. (Tr. at 953.)

Based on the RFC, and relying on the testimony of the VE, the ALJ determined that plaintiff could perform jobs existing in significant numbers, including machine feeder, laundry worker, and production inspector. (Tr. at 954-55.) He accordingly found that she was not disabled since September 1, 2010. (Tr. at 955.)

The Appeals Council denied review on April 3, 2017. (Tr. at 929.) This action followed.

## II. STANDARD OF REVIEW

The court reviews an ALJ's decision to determine whether it applies the correct legal standards and is supported by substantial evidence. Summers v. Berryhill, 864 F.3d 523, 526 (7th Cir. 2017). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. The court may not, under this deferential standard, re-weigh the evidence or substitute its judgment for that of the ALJ. Id. But this does not mean that the court will simply rubber-stamp the decision without conducting a critical review of the record. Minnick v. Colvin, 775 F.3d 929, 935 (7th Cir. 2015). The court may not uphold a decision, even if the record contains evidence supporting it, if the ALJ failed to mention highly pertinent evidence or failed to build an accurate and logical bridge between the evidence and the outcome. Parker v. Astrue, 597 F.3d 920, 921 (7th Cir. 2010). Finally, while the ALJ may rely on VE testimony in identifying jobs the claimant can do, he must ensure that such testimony is reliable and consistent with the vocational information in the Dictionary of Occupational Titles ("DOT"). See Overman v. Astrue, 546 F.3d 456, 463-64 (7th Cir. 2008).

19

## III. DISCUSSION

### A.    Drs. Spear and Musholt

Agency psychological consultants Spear and Musholt prepared reports in 2010 and 2012 endorsing a number of "moderate" mental limitations.  As plaintiff notes (Pl.'s Br. at 3-4), the ALJ did not discuss those reports in his decision, nor did he include the recommended moderate limitations in the RFC or his hypothetical question to the VE.  See Varga v. Colvin, 794 F.3d 809, 814 (7th Cir. 2015) (remanding where ALJ failed to include in hypothetical various moderate limitations recommended by agency psychologist).

The Commissioner responds that the error is harmless, as the consultants concluded that plaintiff could nevertheless perform unskilled work, and the ALJ reasonably relied on the testimony of Dr. Adams in determining mental RFC.  (Def.'s Br. at 3-5.)  The Commissioner further notes that moderate limitations do not necessarily mean the person is unable to work.  See Radosevich v. Berryhill, No. 16-C-1119, 2017 U.S. Dist. LEXIS 150936, at *50-51 (E.D. Wis. Sept. 18, 2017) (discussing recent rule revision clarifying that a moderate limitation means the person's ability to function in that area is "fair"); 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C) (indicating that "marked" rather than "moderate" limitations are needed to satisfy the mental impairment Listings).)

While the consultants did state that plaintiff should be able to perform unskilled work, the ALJ did not adopt those conclusions; in any event, a limitation to unskilled work does not necessarily capture limitations in concentration, persistence, and pace.  Varga, 794 F.3d at 814-15 (collecting cases).  Nor did the ALJ explain why he adopted Dr. Adams's limitations over those recommended by Drs. Spear and Musholt.  See Zblewski v. Schweiker, 732 F.2d

75, 78-79 (7ᵗʰ Cir. 1984):

> In the absence of an explicit and reasoned rejection of an entire line of evidence, the remaining evidence is "substantial" only when considered in isolation. It is more than merely "helpful" for the ALJ to articulate reasons (e.g., lack of credibility) for crediting or rejecting particular sources of evidence. It is absolutely essential for meaningful appellate review. As the Third Circuit put it in <u>Cotter v. Harris</u>, 642 F.2d 700, 705 (3d Cir. 1981), when the ALJ fails to mention rejected evidence, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored."

Finally, the argument here is not that moderate limitations preclude all work, but rather that such limitations should be included in the hypothetical so the VE can offer reliable testimony on jobs the claimant can do. The matter must be remanded for consideration of the agency psychological consultants' reports.[5]

## B.    Credibility

Plaintiff next challenges the ALJ's symptom evaluation. For the most part, her arguments fail to gain traction. <u>See</u> <u>Summers</u>, 864 F.3d at 528 ("We give the ALJ's credibility finding special deference and will overturn it only if it is patently wrong.") (internal quote marks omitted).

Plaintiff first argues that the ALJ relied on meaningless boilerplate (i.e., that her statements were "not entirely consistent" with the evidence of record) and failed to explain which statements were credited and which were not. (Pl.'s Br. at 5, citing <u>Bjornson v. Astrue</u>, 671 F.3d 640, 645 (7ᵗʰ Cir. 2012).) As the Seventh Circuit has noted, use of boilerplate

---

[5]In reply, plaintiff contends that the court already determined, in the first remand order, that the ALJ's failure to evaluate the moderate mental limitations was harmful error requiring correction. <u>See</u> <u>Wilder v. Apfel</u>, 153 F.3d 799, 803 (7ᵗʰ Cir. 1998) (explaining that a court's remand order establishes the law of the case). "New evidence can furnish compelling grounds for departure from a previous ruling." <u>Id.</u> However, the Commissioner fails to establish that Dr. Adams's testimony constitutes such evidence.

language is harmless so long as the ALJ goes on to provide specific reasons, e.g., Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012), and "an ALJ's credibility findings need not specify which statements were not credible." Shideler v. Astrue, 688 F.3d 306, 312 (7th Cir. 2012). The ALJ provided specific reasons here, finding that the medical records failed to fully substantiate plaintiff's allegations of disabling symptoms, and that her reported activities, including part-time employment, suggested greater physical and mental capacity than alleged. (Tr. at 946.).

Plaintiff criticizes the ALJ for relying on her part-time job without explaining how that job proved she could work full-time. (Pl.'s Br. at 6.) The ALJ did not cite this job as proof that plaintiff could work full-time. Rather, he cited it as evidence that plaintiff could engage in activities involving at least a light level of exertion (Tr. at 948) and the mental abilities and social interaction required for employment (Tr. at 950). See Fifield v. Berryhill, No. 17-C-81, 2017 U.S. Dist. LEXIS 188816, at *53 (E.D. Wis. Nov. 15, 2017) ("[T]here is a critical difference between an ALJ improperly saying, the claimant can perform this range of activities, therefore he can work, see Roddy v. Astrue, 705 F.3d 631, 639 (7th Cir. 2013), and an ALJ reasonably saying that the claimant can perform this range of activities, therefore he can do more than he claims, see Pepper v. Colvin, 712 F.3d 351, 369 (7th Cir. 2013)."); Feyen v. Colvin, No. 13-C-1380, 2014 U.S. Dist. LEXIS 127403, at *17-18 (E.D. Wis. Sept. 11, 2014) (indicating that while SSR 96-8p requires evaluation of the claimant's ability to work full-time, a claimant's part-time work may undercut her claims if it involves tasks beyond her alleged capacity, and collecting cases).[6]

_____

[6]As discussed at the end of this section, the ALJ should on remand consider plaintiff's statements regarding the difficulties she had performing this job and the reasons she left it.

Plaintiff faults the ALJ for failing to complete the "highly individualized" assessment of her ability to handle work stress required by the regulations. (Pl.'s Br. at 7, citing SSR 85-15, 1985 SSR LEXIS 20, at *15.) The ALJ limited her to occasional contact with coworkers, supervisors, and the public, but plaintiff contends that duration was not the issue; rather, as she indicated in one of her reports, she did not get along with authority figures because "they have no patience for me." (Tr. at 346.) However, the ALJ relied on the evidence that plaintiff was able to complete high school, cooperate with DVR personnel, and maintain part-time employment, despite her problems (Tr. at 950), as well as the testimony of the psychological expert regarding plaintiff's ability to tolerate work stress and changes (Tr. at 952). The ALJ acknowledged plaintiff's statement that authority figures did not have patience for her, but noted that she was able to maintain relationships and denied ever having lost employment due to problems getting along with others. (Tr. at 942.)

Plaintiff next argues that the medical evidence does support her claims of disabling symptoms, and that the ALJ overstated the effectiveness of her medications. (Pl.'s Br. at 8-11.) The ALJ discussed the medical evidence in some detail (Tr. at 945-51), citing records where plaintiff described her pain as "mild" (Tr. at 946), reported no seizures for several months after restarting Lamictal (Tr. at 947), and sought infrequent and conservative treatment (Tr. at 950). A reviewing court will not re-weigh the evidence. See Schmidt v. Barnhart, 395 F.3d 737, 747 (7th Cir. 2005) (affirming adverse credibility finding where the claimant's contentions were "nothing more than a rehash of the medical records").

Plaintiff further argues that the medical opinions support the limitations she alleged. She begins with Dr. Caufield, who diagnosed depression, anxiety, mild mental retardation, seizure disorder, and Tourette's syndrome, which would likely lead to difficulties with her ability to

23

maintain competitive employment. (Pl.'s Br. at 11-12; Tr. at 851.) The ALJ considered Dr. Caufield's report, crediting his opinion that plaintiff could follow simple directions, but explaining that his opinion that plaintiff would have trouble maintaining employment due to seizures and mood fluctuations was inconsistent with plaintiff's treatment history for seizures, observations of treating and examining providers noting appropriate interaction, and plaintiff's part-time employment that did not end due to termination for deficits in either cognitive or social function. (Tr. at 953.) Plaintiff also cites Dr. Kula's records as support (Pl.'s Br. at 13-14), but the ALJ accepted Dr. Kula's opinions that plaintiff could not handle complex tasks, workplace changes, or organization of activities, incorporating related limitations into the RFC. (Tr. at 952.)

Plaintiff contends that Dr. Anderson's notes support her claims of significant pain and inability to sustain full-time work, noting that on various occasions she described her pain as "moderate." (Pl.'s Br. at 14.) But the records do contain numerous notations of "mild" pain (Tr. at 1575, 1576, 1577, 1578, 1581, 1583, 1584, 1585, 1586, 1587, 1588, 1589, 1591, 1592, 1593, 1594, 1595, 1596, 1597, 1598, 1599, 1600, 1601, 1602, 1603, 1604, 1605, 1606, 1607, 1608, 1609, 1610, 1611, 1612, 1613, 1614, 1615, 1616, 1617, 1618, 1619, 1620, 1621, 1622, 1623, 1624, 1625, 1626, 1630, 1631, 1632, 1633, 1634, 1635, 1636, 1637, 1638, 1639, 1640, 1641, 1642, 1643, 1644), as the ALJ said (Tr. at 951). The ALJ also considered Dr. Anderson's opinions, accepting that plaintiff was limited to light work due to back pain, but declining to adopt his conclusion that she was limited to part-time work. (Tr. at 951.)

Plaintiff notes that in the fall of 2015 Dr. Anderson referred her to a rheumatologist, Dr. Mahmood, based on her complaints of pain and fatigue. (Pl.'s Br. at 15; Tr. at 1413-18.) Dr. Mahmood noted a likely diagnosis of fibromyalgia, prescribing Cymbalta, and in February 2016 plaintiff reported some improvement. (Tr. at 1431.) Her pain persisted, however, so in July

24

2016 Dr. Mahmood added cyclobenzaprine. (Tr. at 1433.) The ALJ discussed this diagnosis and treatment (Tr. at 945, 946), but plaintiff contends that the ALJ discounted the limiting effects of fibromyalgia based on factors that have nothing to do with the condition. (Pl.'s Br. at 16, citing Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996) ("Since swelling of the joints is not a symptom of fibromyalgia, its absence is no more indicative that the patient's fibromyalgia is not disabling than the absence of headache is an indication that a patient's prostate cancer is not advanced.").) The ALJ does not appear to have made the same mistake as in Sarchet. Rather, after discussing the fibromyalgia diagnosis and treatment, the ALJ cited a medical record from August 2016, in which plaintiff denied fatigue, musculoskeletal pain, gait problems, or neurological issues. (Tr. at 947, citing Tr. at 1529.) In any event, plaintiff cites no medical evidence, from Dr. Mahmood or any other source, supporting greater limitations based on fibromyalgia.

Plaintiff cites Dr. Hischke's evaluation, during which she said she had seizures and her husband reported witnessing four seizures during the time they had been together. (Pl.'s Br. at 16; Tr. at 472.) The ALJ considered Dr. Hischke's evaluation (Tr. at 948, 953), and plaintiff fails to explain how these statements undercut the ALJ's evaluation of her seizures. As the ALJ noted, plaintiff told treating providers that she went months between episodes after she re-started on medication. (Tr. at 947.)

Plaintiff also cites the report from Dr. Byrd (Pl.'s Br. at 16), who opined that plaintiff could perform light work avoiding even moderate exposure to hazards (Tr. at 480, 483), noted that she wore a brace/splint for carpal tunnel syndrome, and found her "credible." (Tr. at 486.) The ALJ gave great weight to Dr. Byrd's report but adopted an even more restrictive RFC (light work, avoiding all hazards, with postural limitations) based on the later medical records. (Tr.

25

at 950-51.)  Dr. Byrd noted the wrist splint, but she recommended no manipulative limitations. (Tr. at 482.)  Plaintiff cites medical records discussing her wrist pain (Pl.'s Br. at 16-17), but she cites no medical opinion evidence suggesting limitations based on this condition.[7]  Nor does she challenge the ALJ's finding that this was not a severe impairment.  (Tr. at 940-41.)  Finally, credibility is a matter for the ALJ (not a reviewing physician) to determine, based on the entire record.

Plaintiff contends that Dr. Kravitz's testimony from the first hearing supports greater limitations.  (Pl.'s Br. at 17.)  Based on the evidence available at that time, Dr. Kravitz found moderate limitations under the B criteria of the Listings (Tr. at 93), although he stated that "she seems more limited than the record would indicate."  (Tr. at 92.)  In the decision under review, the ALJ gave partial weight to Dr. Kravitz's testimony, as he did not have the opportunity to review the entire record.  (Tr. at 952.)  By the time he issued the second decision, the ALJ had updated the record, redetermining RFC accordingly and with the assistance of additional expert testimony.  Plaintiff appears to argue that Dr. Kravitz's testimony supports her statements regarding the length and frequency of her seizures, but she fails to explain how.  (Pl.'s Br. at 18.)  The ALJ considered plaintiff's statements regarding her staring spells (Tr. at 945), but noted that she told treating providers that she went months without an episode after she resumed Lamictal (Tr. at 947).

Plaintiff further contends that Dr. Holan's testimony supports a finding that she could not sustain full-time work.  (Pl.'s Br. at 19.)  She relies on a confusing exchange in which Dr. Holan appeared to agree with counsel that plaintiff could be symptomatic for 10 minutes per hour,

---

[7]Dr. Ahmed opined that plaintiff had no significant limitations with reaching, handling, and fingering.  (Tr. at 35.)

during which time she would be unable to do simple activities.  (Tr. at 1017.)  On follow-up questioning by the ALJ, Dr. Holan clarified that while that could be possible, he did not think it would happen each and every hour throughout an eight-hour workday.  (Tr. at 1019.)  He further clarified that if plaintiff had a seizure she would be unable to do simple tasks (Tr. at 1025), but nothing in the record suggested seizures of such frequency as to support a 10 minute limitation each and every hour (Tr. at 1026).[8]

Plaintiff argues that the ALJ improperly relied on his own medical expertise to interpret the evidence, such as her past part-time work, in evaluating Dr. Ahmed's opinions.  (Pl's Br. at 13.)  The ALJ relied on a number of factors in giving this report little weight, including Dr. Ahmed's own treatment notes, which documented no deficits in physical function and good control of seizures with medication; plaintiff's ability to maintain part-time employment for over a year and consistently attend DVR meetings, which contradicted Dr. Ahmed's opinion regarding absenteeism; and Dr. Ahmed's apparent consideration of plaintiff's mental impairments, an area outside his expertise.  (Tr. at 951.)  These factors track the regulations, see 20 C.F.R. § 416.927(c) (directing ALJ to consider the support provided by a source for his opinion, the consistency of the opinion with the record as a whole, and the source's

---

[8]At the end of this section of her brief, plaintiff indicates that Dr. Holan was unable to cite any support in the record for his determination that plaintiff was able to lift 20 pounds occasionally and 10 pounds frequently.  (Pl.'s Br. at 19, citing Tr. at 1027.)  However, plaintiff makes no argument that she could not, in fact, lift that much.  Her own doctor agreed with this limitation (Tr. at 34), in her function report plaintiff listed a lifting limitation of 30 pounds (Tr. at 348), and at the second hearing she said she could lift 15-25 pounds (Tr. at 1002).  Plaintiff also faults the ALJ for interrupting his questioning of Dr. Adams regarding the number of times she flunked the driver's test, suggesting that physical impairments may have played a role.  (Pl.'s Br. at 20, citing Tr. at 1035-36.)  Plaintiff's counsel and the ALJ ultimately agreed that there was no proof in the record as to the reason for these failures.  (Tr. at 1036.)  Plaintiff fails to explain how this constitutes reversible error or why it requires rejection of Dr. Adams's opinion in favor of Dr. Ahmed's.  (Pl.'s Br. at 20-21.)

specialization), and the case-law, see, e.g., Loveless v. Colvin, 810 F.3d 502, 507 (7th Cir. 2016) (affirming where the treating source's notes recorded the claimant's subjective complaints yet contained few findings on exam); Henke v. Astrue, 498 Fed. Appx. 636, 640 (7th Cir. 2012) ("The ALJ rightly emphasized that Dr. Preciado's sweeping conclusions lacked support in his own treatment notes."); Scott v. Astrue, 730 F. Supp. 2d 918, 931 (C.D. Ill. 2010) (affirming where treating source opinion was inconsistent with treatment notes and the claimant's daily activities and other work activities). As indicated, the ALJ also considered the medical opinions from Drs. Holan, Byrd, Anderson, Adams, Kula, Kravitz, Caufield, and Hischke, assigning specific weight to each, in fashioning RFC. See Thorps v. Astrue, 873 F. Supp. 2d 995, 1006 (N.D. Ill. 2012) ("That's not playing doctor, that's weighing the evidence.").

Plaintiff next argues that the DVR records support her claim that she cannot sustain regular work. (Pl.'s Br. at 21.) Specifically, DVR personnel believed she "would need lots of supports when seeking work and when she secure[s] a job" (Tr. at 888), it was unclear if she was OK to drive (Tr. 907), and on one occasion she reported two staring episodes that day (Tr. at 911). The ALJ discussed the DVR records, which noted that plaintiff attended all of her meetings, walking to some of them, and was prompt and pleasant. The ALJ further noted that plaintiff subsequently obtained and maintained part-time employment for over a year. (Tr. at 950.)

Finally, plaintiff identifies a number of statements from her testimony at the two hearings and from her written reports which the ALJ did not specifically discuss. (Pl.'s Br. at 21-28.) It is well-settled that the ALJ need not "discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability." Jones v. Astrue, 623 F.3d 1155, 1162 (7th Cir. 2010). However, because the matter must be

remanded for other reasons, and because some of these statements appear to contradict important findings, the ALJ should consider them on remand.

Specifically, the ALJ should, before relying on plaintiff's ability to maintain a part-time job, consider whether she needed special help to learn the job (Tr. at 56 – testimony that DVR helped), whether she was able to perform it to competitive standards (Tr. at 999 – testimony that she improperly scooped ice and let the sink overfill), and whether she left the job because of her impairments (Tr. at 980 – testimony that her body was falling apart and she experienced higher stress and anxiety). See Lanigan v. Berryhill, 865 F.3d 558, 565 (7th Cir. 2017) ("Instead of acknowledging the employer's commendable generosity, the ALJ assumed that Lanigan's work performance was no different than any other employee's."). The ALJ should also consider the assistance and direction plaintiff received from her husband in completing household activities. (Tr. at 998; see also Tr. at 342 – "need someone to keep me on track".) See Moss v. Astrue, 555 F.3d 556, 562 (7th Cir. 2009) ("An ALJ cannot disregard a claimant's limitations in performing household activities."). Finally, the ALJ should more fully explain how the evidence as a whole supports a finding that plaintiff could sustain regular, full-time employment. See Larson v. Astrue, 615 F.3d 744, 752 (7th Cir. 2010) (citing SSR 96-8p, 1996 SSR LEXIS 5, at *2).

## C.    Vocational Evidence

Plaintiff argues that, because the ALJ failed to properly evaluate her testimony and the medical evidence, his hypothetical question failed to include all of the limitations supported by the record. (Pl.'s Br. at 28, citing Stewart v. Astrue, 561 F.3d 679, 684 (7th Cir. 2009) ("When an ALJ poses a hypothetical question to a vocational expert, the question must include all limitations supported by medical evidence in the record.").) The ALJ should modify the

29

hypothetical, as appropriate, after reconsidering the evidence on remand.

Plaintiff further argues that the jobs identified by the VE are, according to the DOT, more demanding than the ALJ's hypothetical would allow, a conflict the ALJ failed to recognize and resolve. (Pl.'s Br. at 29-30, citing SSR 00-4p.) Specifically, she notes that, while the ALJ limited her to simple/routine work, the VE identified unskilled jobs with an SVP of 2. SVP ("Specific Vocational Preparation") refers to the amount of time needed to learn a job,[9] not the complexity of the tasks, which is instead measured under the DOT's GED/reasoning level. Reasoning level 1 states: "Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job."[10] Reasoning level 2 states: "Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations."[11] The jobs identified by the VE here – machine tender,[12] laundry worker,[13] and production inspector/sorter[14] – all have a reasoning level of 2, which, plaintiff contends, exceeds her abilities.[15] Plaintiff further notes that, according to the DOT, the machine tender job involves

_____

[9]https://occupationalinfo.org/appendxc_1.html#II.

[10]https://occupationalinfo.org/appendxc_1.html#III.

[11]Id.

[12]https://occupationalinfo.org/55/556685038.html.

[13]https://occupationalinfo.org/58/589685038.html.

[14]https://occupationalinfo.org/75/753587010.html.

[15]Plaintiff's argument is not, as the Commissioner contends, that SVP level 2 is more demanding than unskilled work. (Def.'s Br. at 17.) Rather, plaintiff argues that SVP level 2 jobs, which are unskilled, see SSR 00-4p, 2000 SSR LEXIS 8, at *8, are not necessarily

the use of an injection molding machine, the laundry worker job a cleaning machine, and the sorter job a conveyer belt, contrary to the ALJ's restriction of hazards, including dangerous moving machinery.

As I discussed in <u>Mattison v. Astrue</u>, No. 09-C-60, 2009 U.S. Dist. LEXIS 81056, at *89 (E.D. Wis. Aug. 21, 2009), "Courts are divided on whether a limitation to 'simple, routine' work . . . is consistent with the ability to follow 'detailed but uninvolved' instructions." <u>See also</u> <u>Bornkamp v. Comm'r of Soc. Sec.</u>, No. 1:14-cv-00401-SLC, 2016 U.S. Dist. LEXIS 130986, at *25-26 (N.D. Ind. Sept. 23, 2016) (discussing the issue). In <u>Mattison</u>, given other flaws in the ALJ's analysis, I found it appropriate to remand without choosing a side. 2009 U.S. Dist. LEXIS 81056, at *92. I follow the same course here.[16]

Regarding the other alleged conflict, the Commissioner argues that none of the identified jobs involve hazards such as moving mechanical parts of machinery. (Def.'s Br. at 17.) However, it is difficult for me to determine, based on the bare descriptions set forth in the DOT, whether these jobs involve the kinds of hazards the ALJ excluded. The best course is to remand so the ALJ can resolve the issue with the assistance of a VE.

## IV. CONCLUSION

Plaintiff argues that the matter should be remanded for an award of benefits, but that step is appropriate "only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion – that the applicant qualifies

_____

synonymous with simple, routine work.

[16]Plaintiff's counsel attempted to address this issue with the VE at the second hearing, asking whether jobs involving simple tasks would have a reasoning level of 1. The VE said he did not know. The VE did acknowledge that the DOT did not talk about simple tasks under SVP; the only place the Dictionary did so was under reasoning level. (Tr. at 1048.)

for disability benefits." <u>Allord v. Astrue</u>, 631 F.3d 411, 415 (7th Cir. 2011). As discussed above, issues remain for the ALJ to resolve on remand, including consideration of the agency psychological consultants' reports and aspects of plaintiff's testimony. He must also resolve the vocational issues plaintiff raises. That the ALJ may have erred at this step of the analysis does not require a judicial award. <u>See</u> <u>Gotz v. Barnhart</u>, 207 F. Supp. 2d 886, 903 (E.D. Wis. 2002) (stating that ALJ's failure to obtain sufficient evidence from VE is an adjudicator making a mistake, not a party litigator failing to present evidence, and that the proper remedy is generally not an automatic award of benefits but a remand for further proceedings).

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and the matter is remanded for further proceedings consistent with this decision. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 25th day of April, 2017.

/s Lynn Adelman
LYNN ADELMAN
District Judge